**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **JAMES J. SILVA** | : | |
| | : | |
| **vs.** | : | **C.A. No. 04-361-S** |
| | : | |
| **JUDGE MICHAEL HIGGINS** | : | |
| **CITY OF PAWTUCKET, and** | : | |
| **THE OFFICE OF THE ATTORNEY** | : | |
| **GENERAL** | : | |

**STATE OF RHODE ISLAND'S MOTION TO DISMISS PETITIONER'S "AMENDED COMPLAINT, PETITION FOR WRIT OF HABEAS CORPUS AND FEDERAL QUESTION" AND "SUPPLEMENT TO AMENDED PETITION, AFFIDAVIT AND MEMORANDUM DATED, SEPTEMBER 16 – 2004"**

Now comes the State of Rhode Island, by and through its attorneys, and, for the reasons expressed in the accompanying memorandum, respectfully moves to dismiss Petitioner's above-captioned "Amended Complaint, Petition for Writ of Habeas Corpus and Federal Question", and "Supplement to Amended Petition, Affidavit and Memorandum Dated, September 16 – 2004."

Respectfully Submitted,

**STATE OF RHODE ISLAND**
By Its Attorneys,
**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

Stephen G. Regine AAG 8/11/05

**STEPHEN REGINE, # 4691**
**AARON L. WEISMAN, #4438**
Department of Attorney General
150 South Main Street
Providence, RI 02903

(401) 274-4400

**CERTIFICATION**

I hereby certify that on the 11th day of August, 2005, I placed a copy of the within document in the U.S. mail, postage prepaid, to James J. Silva, at his last known address of P.O. Box 8249, Cranston, RI 02920.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **JAMES J. SILVA** | : | |
| | : | |
| **vs.** | : | **C.A. No. 04-361-S** |
| | : | |
| **JUDGE MICHAEL HIGGINS** | : | |
| **CITY OF PAWTUCKET, and** | : | |
| **THE OFFICE OF THE ATTORNEY GENERAL** | : | |

**STATE OF RHODE ISLAND'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PETITIONER'S "AMENDED COMPLAINT, PETITION FOR A WRIT OF HABEAS CORPUS AND FEDERAL QUESTION" AND "SUPPLEMENT TO AMENDED PETITION, AFFIDAVIT, AND MEMORANDUM DATE, SEPTEMBER 16-2004"**

A. Background

Petitioner is currently incarcerated at the Rhode Island Adult Correctional Institutions for want of $2,000 cash bail in Criminal Information P2-2004-3106A (violation of a protective order (*please see* R.I.G.L. § 15-15-3)) and $2,000 cash bail in Criminal Information P2-2005-0362A (felony stalking (*please see* R.I.G.L. § 11-59-2)), imposed by the Rhode Island Superior Court on October 14, 2004 and February 28, 2005 respectfully. The relevant state travel leading up to the imposition of such Superior Court bail determinations is as follows.[1]

On July 28, 2004, Petitioner was taken into the custody of the Pawtucket Police[2] on an allegation (Felony Complaint Number 62-2004-14367) that he had violated a no-

[1] The travel that follows attempts to address the questions posed by this Court in its Order of July 29, 2005.

[2] To the best of the undersigned's knowledge and belief, Petitioner arrived into the custody of the Pawtucket Police after being called by such Department and being asked whether he wanted to pursue an unrelated internal affairs investigation, and then being

contact order by engaging in certain actions with respect to his ex-wife the previous evening. When he was presented, the following day (July 29, 2004), in the Rhode Island District Court on such Complaint, it was learned that his actions had violated, not (as originally thought) a no-contact order but, a Rhode Island Family Court *Judgment Protection From Abuse Order (please see attached)*; and the Felony Complaint was accordingly amended by the Assistant Attorney General in the District Court that day, and the District Court (Higgins, J.) then proceeded to set $1,000 cash bail on such amended Felony Violation-of-Family-Court-Order Complaint and, additionally, imposed a no-contact order as a condition of bail.

Subsequently, while incarcerated (unable to post the $1,000 cash bail), Petitioner wrote a number of threatening letters to his ex-wife's current boyfriend.[3] As a consequence of these letters, the State alleged that he was in violation of the terms and conditions of the bail which had been set by Judge Higgins, and further that he had committed the substantive offense of stalking (District Court Felony Complaint Number 62/2004-18930). Accordingly, on September 16, 2004, he was presented as a bail violator (and held pending the violation hearing), and, on October 7, 2004, when an Attorney (Mark Smith) entered to represent him, was arraigned on the Felony Stalking Complaint (Number 62/2004-18930) and assigned $2,000 cash bail. Five days later, on October 12, 2004, the State presented to the District Court its case that Petitioner had violated the terms and conditions of the $1,000 cash bail imposed by the District Court on July 29, 2004; and Petitioner at such hearing was represented by counsel Mark Smith. At

---

taken by North Smithfield police (Petitioner was then living in North Smithfield) to the Pawtucket Police station.

[3] These letters were quite vulgar and were highly threatening.

the conclusion of that day's proceedings, the bail violation hearing was continued for the presentation of the Petitioner's case. Two days later, on October 14, 2004, Petitioner was arraigned in the Superior Court on Criminal Information P2-2004-3106A (the ripened District Court Felony Complaint Case of Felony Complaint Number 62-2004-14367), bail was set at $2,000 cash, and Attorney Mark Smith was present for the arraignment and entered his appearance on Petitioner's behalf. A number of days later, on November 4, 2004, Petitioner's attorney, Mark Smith, moved to withdraw from representing the Petitioner. (*Please see* the November 4, 2004 *Motion to Suspend Contempt and Bail Revocation Hearing*.) As a consequence of this motion, and (as earlier stated) the fact that Defendant had already been arraigned in the Superior Court on a felony violation of a protective order (P2-2004-3106A), the prosecutor opted not to proceed with the District Court (Moore, J.) bail violation hearing, which recommenced on November 9, 2004; and, on that date, the prosecutor withdrew the bail violation allegation.[4] Attorney Smith (Petitioner's counsel) was not present on that November 9, 2004 date,[5] and his motion to withdraw was ultimately granted on December 7, 2004. On January 14, 2005, new counsel – Attorney Ken Vale – was appointed to represent Petitioner on pending case P2/04-3106A, and on January 28, 2005, Mr. Vale entered his appearance. Subsequently, on February 28, 2005, Petitioner was arraigned in the Superior Court on P2-2005-0362A (felony stalking, in violation of R.I.G.L. § 11-59-2) – the ripened Felony Complaint Number 62/2004-18930 District Court case – and $2000 cash bail was set; Attorney Ken

[4] To the best of the undersigned's knowledge, Plaintiff objected to the State's withdrawal of the violation-of-bail allegation; no "appeal" of such action appears to have been taken.

[5] As a consequence of the bail violation allegation being withdrawn, Attorney Mark Smith's motion to withdraw was passed.

Vale represented him on this case as well, but, at Petitioner's request, only as stand-by counsel. In early March of 2005, Attorney Vale filed on Petitioner's behalf a motion (and supporting memorandum) to dismiss the P2-2005-0362A (felony stalking, in violation of R.I.G.L. § 11-59-2) case, and Petitioner filed a motion to dismiss the felony violation of a protective order (P2-2004-3106A) case. Among the grounds averred in support of Petitioner's motion was a double jeopardy contention. The State responded to the motions to dismiss on March 30, 2005.[6] (*Please see attached.*) Thereafter, on April 7, 2005, Ken Vale's motion to withdraw – predicated upon the threatening correspondence he alleged Petitioner had sent him – was granted, and the Defendant then requested of the Superior Court motion justice that he be allowed to proceed pro se in his cases. The matters were thereafter placed on the trial calendar for July 25, 2005, and the Petitioner then appeared before justice Vogel and represented to her that he now wished either to be appointed yet another attorney or be able to retain one; as a consequence, Petitioner was not ready for trial. Justice Vogel, who had been assigned both of Petitioner's cases, then continued the matter to August 15, 2005 in order to determine Petitioner's counsel requests. Currently, Petitioner's cases are pending for determination of Petitioner's willingness to hire counsel.

B. Discussion

In Petitioner's instantly filed "Amended Complaint, Petition for Writ of Habeas Corpus and Federal Question", and "Supplement to Amended Petition, Affidavit and

[6] The Superior Court has not yet ruled on Petitioner's motions, however, because, upon information and belief, on May 2, 2005, the Petitioner asked Magistrate Judge Keough to put off determination of his submission so as to allow the federal court to hear his contentions. Petitioner was advised at that proceeding, that such request could affect his right to a speedy trial.

Memorandum dated, September 16 – 2004", Plaintiff appears to contend that 1) a provision of R.I.G.L. § 12-29-3 ("Law enforcement officers – Duties and immunity") is unlawful as applied to him, and 2) that the Pawtucket Police lacked probable cause for his arrest. He accordingly asks that this Court "free him from his unlawful confinement". Principles of abstention, however, warrant the dismissal of Plaintiff's instant petition. As the United States Court of Appeals for the First Circuit explained in In re Justices of Superior Court Dept. of Mass., 218 F.3d 11, 16-18 (1st Cir. 2000):

> The federal courts have long recognized the "fundamental policy against federal interference with state criminal proceedings." Younger v. Harris, 401 U.S. 37, 46, 91 S.Ct. 746, *** (1971). This policy is rooted firmly in the basic federal structure of our government. Two fundamental concepts underlie our constitutional system of government; one is the precept of "separation of powers" and the other is the doctrine of federalism. The latter concept, which is most acutely at issue in this case, reflects the Founders' determination that the best governance would result if sovereignty, rather than being collected entirely within the new government, were split between the new national government and the various state governments, as was expressed somewhat "after the fact" in the Tenth Amendment to the Constitution. ***
>
> As early as 1793, Congress manifested its understanding and intention that the state courts be allowed to conduct state proceedings free from interference by the federal courts, when it prohibited the federal courts from issuing injunctions to stay proceedings in state court. *** This congressional policy, subject to only a few exceptions, has remained essentially unaltered to this day, *** and is reflected in the federal courts' own policies, including most notably the abstention doctrine developed in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, *see, e.g.,* Middlesex Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).
>
> As the Supreme Court has recognized, the policy against federal interference with state judicial proceedings is premised on a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. *** It is this

fundamental consideration that has led the federal courts to abstain from interfering with state court proceedings even where defendants claim violations of important federal rights. *See, e.g.,* Younger, 401 U.S. at 53, 91 S.Ct. 746 (First Amendment claims); ***

Defendants argue that the abstention doctrine and its underlying principles do not apply to this case, emphasizing that they are not seeking an injunction or other equitable relief against the state proceedings (such as was involved in *Younger* ), but rather are pursuing a habeas remedy provided for and governed by statute. We find this position unavailing primarily for two reasons.

First, although we appreciate the difference between a request for equitable relief and a request for statutory relief generally, the practical difference between the relief requested in defendants' habeas petition and an ordinary injunction is minimal. Defendants' petition for writ of habeas corpus specifically asks the district court to "grant the writ and discharge petitioners from custody." Pet. for Writ of Habeas Corpus, Commonwealth v. Ellis, Case No. 99-CV-10915-NG (D.Mass.), at 9. Such discharge, of course, would be tantamount to an injunction requiring the defendants' release and prohibiting the state from proceeding with the current prosecution. Whatever distinctions might exist between the two remedies, the difference in this case is essentially "semantic." ***

Second, even accepting the distinction between equitable relief and statutory remedies, Younger speaks of the policy against federal *interference* with state court proceedings, a reference which we do not read as limited exclusively to equitable relief. *** Furthermore, although defendants quote language from a Supreme Court decision referring to the "statutes, rules, precedents, and practices that control the [habeas corpus] writ's exercise," Lonchar v. Thomas, 517 U.S. 314, 323, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996), and suggest that the body of law surrounding the writ of habeas corpus is self-contained and exclusive of other considerations, there is nothing in the Lonchar decision (or any other case that we are aware of) that purports to render inapplicable one of the fundamental characteristics of our governmental structure--federalism and its mandate that the federal government, including the Judiciary, avoid undue interference with state matters. ***

The applicability of comity and abstention principles to habeas proceedings is amply demonstrated by the courts' treatment of habeas petitions brought prior to conviction in the state proceedings. With only two exceptions to date, *** the federal courts have routinely rejected petitions for pretrial habeas relief raising any variety of claims and issues. *See, e.g.,* Carden v. Montana, 626 F.2d 82, 83-85 (9th Cir.1980) (recognizing general rule prohibiting pretrial habeas relief as "a logical implication of the

> abstention doctrine announced in Younger v. Harris"); Neville v. Cavanagh, 611 F.2d 673 (7th Cir.1979) (affirming denial of pretrial habeas petition even though defendant had exhausted state court remedies, because of abstention considerations); *see also* Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 493, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) ("We emphasize that nothing we have said would permit the derailment of a pending state proceeding by an attempt to litigate constitutional defenses prematurely in federal court."). We particularly note the Seventh Circuit's decision in Neville v. Cavanagh, 611 F.2d 673 (7th Cir.1979), [which] *** affirmed the district court's denial of pretrial habeas relief even though defendant had litigated his claim all the way to, and received a ruling on the merits from, the Illinois Supreme Court. ***
>
> In light of the foregoing, the need for federal abstention in this case is perfectly clear. [internal quotation and citation omitted] *** With the notable exceptions of cases involving double jeopardy and certain speedy trial claims, federal habeas relief, as a general rule, is not available to defendants seeking pretrial review of constitutional challenges to state criminal proceedings, and this case does not present the kind of "special circumstances" which might require a different result. Braden, 410 U.S. at 489, 93 S.Ct. 1123. To the contrary, the weighty federalism concerns implicated by the petition for writ of habeas corpus and by the district court's assertion of jurisdiction make pretrial federal adjudication of defendants' claim inappropriate. *** Defendants are not entitled to consideration of their federal habeas claims until a time when federal jurisdiction will not seriously disrupt state judicial processes. [internal quotation and citation omitted].

Because, then, the Supreme Court in Braden emphasized that "nothing we have said would permit the derailment of a pending state proceeding by an attempt to litigate constitutional defenses prematurely in federal court" (410 U.S. at 493, 93 S.Ct. at 1129), the State would respectfully ask that Plaintiff's contentions – at least one of which he specifically asked the State court to *not* consider so that it could be determined in the first instance in this Court – not be considered in this Court at this time.

C. Conclusion

Wherefore, for the aforementioned reasons, the State would move to dismiss the above-captioned action.

Respectfully Submitted,

**STATE OF RHODE ISLAND**
By Its Attorneys,
**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

Stephen G. Regine AAG 8/11/05

**STEPHEN REGINE, # 4691**
**AARON L. WEISMAN, #4438**
Department of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

**CERTIFICATION**

I hereby certify that on the 11th day of August, 2005, I placed a copy of the within document in the U.S. mail, postage prepaid, to James J. Silva, at his last known address of P.O. Box 8249, Cranston, RI 02920.